# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LANDMARK INSURANCE COMPANY,<br><br>                              Plaintiff,<br>     vs.<br><br>PACIFIC INDEMNITY COMPANY;<br>TRAVELERS INDEMNITY COMPANY;<br>and NORTHWESTERN NATIONAL<br>INSURANCE COMPANY,<br><br>                              Defendants. | CASE NO. 11-CV-0535-LAB-POR<br><br>**ORDER RE: SUMMARY JUDGMENT** |

In 2006, owners of bayfront property in Coronado sued the San Diego Unified Port District and the Army Corps of Engineers over the erosion of their property, which they alleged was caused or exacerbated by dredging activities in the San Diego Bay. (AOE 36.) Plaintiff Landmark Insurance Company paid for the Port District's defense. Now, Landmark seeks indemnification from Defendants who insured the Port District before it did. Landmark's theory of recovery, in essence, is that the erosion was caused by historical dredging activities that took place during the Defendants' policy periods. Now before the Court are cross-motions for summary judgment.

## BACKGROUND

### I.     *SLPR, LLC v. San Diego Unified Port District*

The underlying case between the property owners and Port District has a long history. And that history is critically important here, because Defendants' duty to defend the Port District turns entirely on what it was sued *for*. *See Horace Mann Ins. Co. v. Barbara B.*, 4 Cal.4th 1076, 1081 (1993) ("The determination whether the insurer owes a duty to defend

usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy."). The Court will therefore survey in substantial detail the nature and scope of SLPR's claims against the Port District — how those claims were pled, how SLPR argued them, and how they were ultimately resolved.

### A. SLPR's Original Complaint in California Superior Court - January 2006

SLPR, LLC originally sued the Port District—and only the Port District—in January 2006, in California Superior Court. (AOE 36.) It alleged that the Port District knew as early as December 2000 that the shoreline of the San Diego Bay was eroding because of dredging and shipping activities, and also that a 2004–2005 dredging project caused further erosion and property damage. (*Id.* at 1036–37.) SLPR asserted two causes of action, one for inverse condemnation and another under California Civil Code § 832. With respect to the first, it alleged that "Defendant's dredging activity is the actual cause of the permanent and substantial damage to Plaintiff's property." (*Id.* at 1045.) With respect to the second, it alleged that Defendants "failed to use ordinary care and reasonable precautions during Defendant's dredging operation" and "denied Plaintiff its lawful right to take necessary measures to protect Plaintiff's property prior to the commencement of Defendant's dredging activities." (*Id.* at 1046.) In context, it's clear that the dredging activity being referred to is the 2004–2005 project. It is the only dredging activity specifically identified in the complaint. (*Id.* at 1037.)

### B. SLPR's Amended Complaint in California Superior Court - May 2006

SLPR amended its complaint in May 2006, adding the Army Corps of Engineers as a defendant. (AOE 37.) This complaint identified an additional dredging project that took place in 1998 and 2002. (*Id.* at 1051.) The two causes of action remained the same, with perhaps the only difference being the implied attribution of erosion to the 1998 and 2002 dredging activity in addition to the 2004-2005 dredging activity. (*Id.* at 1061–62.) With the Army Corps of Engineers added to the case, it was removed to this Court in June 2006. *See* 6-CV-1327-MMA-POR.

//

### C. SLPR's Second Amended Complaint in Federal Court - December 2007

Once in federal court, and joined by other bayfront property owners, SLPR filed a second amended complaint in December 2007. (AOE 56.) This complaint also added the United States Navy as a defendant.

The second amended complaint, like the first amended complaint, specifically identified two dredging projects, one in 1998 and 2002 and another in 2004.

> In order to facilitate the home-porting of additional nuclear aircraft carriers at NASNI, Defendants proposed, planned and implemented a dredging operation in the Turning Basin. Plaintiffs believe that the first dredging operation occurred in or about 1998, and a second dredging operation occurred in or about 2002 . . . .
>
> Following the issuance of the December 7, 2000 Army Corps report, in order to improve the efficiency of commercial shipping operations in San Diego Bay, Defendants the Port and Army Corps also proposed and planned a dredging operation in the Channel. On or about October 25, 2004, the Defendants commenced dredging of the Channel. The dredging project ended in or about February 2005.

(*Id.* at 1681–82.) The inverse condemnation and § 832 claims remained, and the plaintiffs added a nuisance claim. (The claims against the Army Corps of Engineers and the Navy were brought under the Administrative Procedures Act.) Again, in context, it is abundantly clear that each of the claims against the Port District was based upon dredging activity beginning in 1998 and ending in 2005.

> [Nuisance] The Defendant Port has authorized and implemented dredging operations by the Navy and Army Corps to allow for increased shipping traffic. These dredging operations have resulted in erosion and continuing damage to Plaintiffs' properties. Such erosion and damage to Plaintiffs' properties are obstructing Plaintiffs' free use of their properties and has interfered, and continues to interfere, with the comfortable enjoyment of their lives and properties.
>
> [§ 832] Defendants' dredging activities have deprived Plaintiffs' properties of such lateral support and as a result have damaged Plaintiffs' properties.
>
> [Inverse Condemnation] Dredging authorized by the Port and/or performed on behalf of the Port is the actual cause of permanent and substantial damages to Plaintiffs' properties.

(*Id.* at 1688–90.)  In fact, SLPR's claims were based substantially on a December 2000 report by the Army Corps of Engineers "evaluating the impact of the dredging activities on the Coronado shoreline," and according to SLPR the report documented that "the 1998 and 2002 dredging activities resulted in the ongoing erosion of the Plaintiffs' properties." (*Id.* at 1681, 1691.)

### D. SLPR's Parallel California Superior Court Case - March 2008

In March 2008 SLPR filed a second case in California Superior Court. (AOE 38.) This case re-asserted nuisance, § 832, and inverse condemnation claims against the State of California. It also added a quiet title claim against California and the Port District. As with the claims in its previous case, SLPR's claims in this case were clearly premised upon dredging activities that began in 1998. (*Id.* at 1072–74.)

### E. Severance of SLPR's Federal Case - October 2009

In October 2009 SLPR's claims against the Port District were severed from the case and remanded to California Superior Court, while their claims against the Corps of Engineers and the Navy remained in this Court. (AOE 59.)  To be clear, the claims against the Port District were essentially tort claims arising under California law, while the claims against the Corps of Engineers and the Navy were federal claims arising under the Administrative Procedures Act.

### F. SLPR's Third Amended Complaint in Federal Court - April 2010

After SLPR's claims against the Port District were remanded to California Superior Court, it filed a third amended complaint against the Army Corps of Engineers and the Navy in this Court in April 2010, reasserting its claims under the Administrative Procedures Act. Although these claims aren't implicated in this case, it's worth noting that SLPR again attributed the property erosion at issue to dredging activities from 1998 to 2005.  For example:

> As documented by the December 2000 report prepared by the Army Corps, the 1998 and 2002 dredging activities resulted in the ongoing erosion of the Plaintiffs' properties, likely resulting in the total loss of use of their properties if corrective action is not performed . . . .

> In or about the mid-1990s Defendant Army Corps issued a permit to the Navy to dredge the Turning Basin. In or about 2004-2005, Defendant Army Corps performed dredging of the Navigation Channel. These acts by the Army Corps were in an official capacity on behalf of the Army Corps.
>
> As documented by the December 2000 report prepared by the Army Corps, these dredging activities resulted in the ongoing erosion of the Plaintiffs' properties, likely resulting in the total loss of use of their properties if corrective action is not performed.

(6-CV-1327, Doc. No. 217 at 21, 23.)

### G.  SLPR's Summary Judgment Brief in California Superior Court - November 2010

The parties filed cross-motions for summary judgment in California Superior Court. SLPR's motion, filed in November 2010, confirms that SLPR was suing the Port District over dredging activities that began in 1998. SLPR opened its supporting brief with the proposition that dredging of the San Diego Bay dated back 150 years and had proven detrimental to its property. (AOE 43 at 1282.) But this is just historical background and has nothing to do with its claims. In its "Statement of Facts" section, it couldn't be more clear that its case against the Port District began in 1998:

> In 1998 and 2002, the Navy dredged the Turning Basin in San Diego Bay to a depth of -50 feet to accommodate three nuclear aircraft carriers that were to be home-ported in the Navy's Turning Basin. In 2004, the Army Corps of Engineers and the Port dredged the Central Navigation Channel in San Diego Bay to a depth of -42 feet so that deeper draft vessels could navigate the interior of San Diego Bay . . . .
>
> Although it was known in official circles at the time of each of these dredging projects that previous dredging projects in San Diego Bay had caused erosion to bayfront properties, the Navy, ACOE, State and Port failed to give serious consideration to the possibility that these projects would cause or exacerbate erosion to bay-front properties . . . . Not only did the Navy, ACOE, State and Port fail to take measures to protect bay-front properties from erosion caused by these dredging projects, but they also failed to give notice to adjacent homeowners that, as a result of these dredging projects, the Plaintiffs' properties would lose their lateral support . . . .
>
> These dredging projects initiated a process of dramatic, ongoing and increasing erosion to Plaintiffs' properties . . . .

//

> Later in this process, after all three of the dredging projects had been completed, David W. Skelly, a civil engineer with expertise in coastal processes and engineering, reviewed the relevant environmental impacts statements, administrative records and other documents pertaining to these dredging projects . . . . In sum, due to these three dredging projects, the Port is losing lateral support for its land, which is, in turn, causing Plaintiffs to lose lateral support for their land.

(*Id.* at 1283–84.) Later in its brief, addressing the merits of its particular claims, SLPR based them explicitly on the recent dredging activity rather than all historical dredging:

> The State and Port have admitted that, although they knew about the Turning Basin and Central Navigation dredging projects before they were performed, they failed to give notice to Plaintiffs. The dredging of the Turning Basin and Central Navigation Channel resulted in the steepening and deepening of the offshore gradients adjacent to Plaintiffs' properties, and the movement of these offshore gradients closer to Plaintiffs' properties . . . . These dredging projects removed lateral support from the Port's land, which, in turn, removed lateral support from the Plaintiffs' land . . . .
>
> With respect to Plaintiffs' nuisance and removal-of-lateral-support claims, Plaintiffs have alleged an ongoing course of conduct, namely, dredging projects performed in San Diego Bay in 1998, 2002 and 2004-2005. This ongoing course of conduct has resulted in the ongoing removal of lateral support, and Plaintiffs' properties have yet to stabilize.

(*Id.* at 1303–04, 1306.)

**H.    California Superior Court's Summary Judgment Ruling - March 2011**

The Port District prevailed on summary judgment in California Superior Court. (AOE 49.) In the opening line of its ruling, the court limited the relevant facts of SLPR's case against the Port District to the 1998 and 2004 dredging projects: "In this case, the owners of several residences along First Street in Coronado claim that the actions of the defendants in approving/allowing/not objecting to two federal dredging projects on San Diego Bay caused them to lose parts of their backyards to tidal erosion. This, they allege, will ultimately threaten the foundations of their homes." (*Id.* at 1351.)

//
//
//

## I. SLPR's Summary Judgment Appeal - September 2011

SLPR appealed its claims against the Port District in June 2011, and that appeal is still pending.[1] (AOE 52.) Like all pleadings before it, SLPR's opening brief makes it very clear that its claims are based upon erosion resulting from dredging activities that began in 1998. (AOE 53.) For example, the very first page of the brief, under the heading "Introduction," attacks the Port District for allowing dredging in the San Diego Bay even though an Army Corps of Engineers report indicated that bayfront property was suffering, and would continue to suffer, erosion. (*Id.* at 1415.) But that report was produced in January 2001. (*Id.* at 1426.) The "Summary of Contentions" section of the brief, in discussing dredging, starts with "three dredging projects" that were "performed in San Diego Bay" between 1998 and 2005. (*Id.* at 1416.) The "Statement of Facts" sections relevant to SLPR's nuisance, inverse-condemnation, and removal-of-lateral-support claims are limited to dredging activities from 1998 forward. For example:

> In 1995, the federal government planned a $175-million project to dredge San Diego Bay's approach and entrance channels . . . . The project was completed in two phases. The first phase, the feasibility phase, spanned approximately seven years, from November 1997, when the Port and federal government entered into the feasibility study agreement, to September 2004, when the Port and federal government entered into the project cooperation agreement. The second phase, the implementation phase, spanned approximately six months, from September 2004, when the Port and federal government entered into the Project Cooperation Agreement, to February 2005, when the Channel dredging was completed . . . .
>
> As noted *supra*, the Port and Army Corps planned and implemented the channel dredging project between August 1995 and February 2005. During that time, they knew that First Street was suffering from erosion. Yet the Port neither recommended the inclusion of erosion mitigation measures as part of the channel dredging project nor implemented mitigation measures as a free-standing Port project . . . .

//

---

[1] SLPR's Administrative Procedures Act claims against the Corps of Engineers and the Navy were also resolved on summary judgment. The Navy was granted summary judgment on the APA claim against it, and of the two APA claims against the Corps of Engineers, the Plaintiffs were granted summary judgment on one and the Corps of Engineers was granted summary judgment on the other. Plaintiffs appealed to the Ninth Circuit, in June 2011, but shortly thereafter voluntarily dropped the appeal.

> The 1998 and 2002 Turning Basin dredging projects created a larger and deeper sediment sink in the Turning Basin immediately adjacent to Landowners' properties. The channel dredging project created a deeper navigation channel, which allows deep-draft vessels to travel parallel to the First Street shoreline. These deeper-draft vessels create larger waves and wakes, which strike the First Street shoreline, suspend sediment, and move the sediment away from the First Street shoreline into the adjacent sediment sink. While a long, shallow shoreline effectively dissipates wave energy, a short, steep shoreline does not. All three dredging projects resulted in the offshore gradient adjacent to First Street becoming shorter, steeper and moving closer to the First Street shoreline, thereby reducing its ability to dissipate wave energy, and reinforcing the process described immediately above . . . .
>
> As noted *supra*, the three dredging projects were performed on the State's land. These projects removed lateral support for the Port's land, which, in turn, removed lateral support for Landowners' land, resulting in ongoing erosion to, and flooding of, such land.

(*Id.* at 1420–22, 1427, 1429–30.) SLPR later explained in a footnote that its nuisance and inverse condemnation claims "are based upon three dredging projects: the Navy's 1998 dredging of the Turning Basin; the Navy's 2002 dredging of the Turning Basin; and the Port and Army Corps' 2004-2005 dredging of the Channel." (*Id.* at 1437 n.11.)

## II.  Landmark's Defense of the Port District

In February 2007, the Port District sent a demand for defense to Landmark.[2] It also sent demands to some of the Defendants. (AOE 15–24.) Landmark initially denied, in August 2007, that it had any duty to defend the Port District. It made several arguments, one of which was that the erosion damage at issue didn't occur during Landmark's policy period. It's worth excerpting this response at some length:

> Independent from the above, the Landmark policies only cover "damages" that are "caused by an occurrence during the policy period." We do not read the complaint in the *SLPR* action as seeking damages for either the May 1, 1982 to May 1, 1983 period, or the May 1, 1984 to May 1, 1985 period . . . .
>
> Rather, the complaint appears to seek relief in connection with activities relating to the "San Diego Harbor Central Bay Channel Deepening Project" ("Project"), as set forth in the "Shared Early Neutral Evaluation Statement of Defendant, the San Diego

---

[2] The demand letter sent to Landmark isn't included in the exhibits submitted to the Court, but other demand letters are and they are dated February 23, 2007. (AOE 15, 16.)

> Unified Port District" ("District's Statement"). We understand the Project occurred well after the Landmark policies expired. In fact, we note the District's Statement focuses on the form and extent of notice the District alleges it provided to the public "with regard to this project dating back to 1998."
>
> We note the "Plaintiff's Early Neutral Evaluation Statement" ("Plaintiff's Statement") references a report that comments on evidence of erosion occurring for a "15 year period between 1985 and 2000." However, the purpose of the reference appears to be historical in nature, and certainly unrelated to any claim of compensable damage against the District based on "wave energy created by boat and ship traffic," which the report concludes is the "primary mechanism" for the alleged erosion.

(AOE 25.) In other words, Landmark denied that it had any obligation to defend the Port District for reasons that are identical to those the Defendants give in this case: the erosion damage at issue didn't occur during its policy period. The Port District took sharp issue with Landmark's denial in a November 2007 response:

> The next issue you raise relates to the timing of the alleged damage. It is abundantly clear from the allegations, read in conjunction with other documents provided to the court to support their case, that plaintiffs are seeking to recover for an allegedly long-standing and progressive erosion and related loss of support. It is equally clear that the reference to dredging between 1985 and 2000 is not exclusive to earlier dredging events. Stated simply, plaintiffs case is premised on continuing and progressive loss that has at least been potentially ongoing during [Landmark's] policy periods. No other conclusion is permissible based on the documents on which the plaintiffs rely.

(AOE 27.) This back-and forth between the Port District and Landmark continued. In December 2007 Landmark again questioned whether the erosion at issue occurred during the time that it insured the Port District.

> Second, please confirm our understanding the property owners in the SLPR action allege their property damage was caused by dredging operations from 1998 to 2005 in the San Diego Bay channel and turning basin.
>
> According to the docket in the SLPR action, the operative pleading remains the First Amended Complaint ("FAC"), pending the Court's ruling on Plaintiff's motion for leave to bring a Second Amended Complaint ("SAC"). The FAC alleges property damage arising from dredging operations in the turning basin from 1998 to 2002 and in the channel from 2004-05 . . . .

//

> None of the[ ] materials [we have reviewed] suggest the District is responsible for erosion of the shoreline, beyond its potential responsibility for the dredging projects since 1998.

(AOE 28.) The Port District didn't budge in a February 2008 response:

> However, we disagree that the alleged damage is limited to dredging operations between 1998 and the present. The documents we previously submitted demonstrate that dredging has not been limited in time as you suggest . . . .
>
> Furthermore, the documents we provided make it clear that plaintiffs' case relies upon reports that reviewed aerial photographs from 1985 and 2000, and concluded that erosion and related property damage had been taking place this entire time. Given the nature of the reports, it is clear that there is at least a potential that this property damage would have been ongoing even before that time . . . .
>
> The reports detailing historic erosion indicate that the erosion was caused by traffic-generated waves and the steep off-shore gradient. As the erosion has been ongoing for decades, the only logical conclusion is that there has been the mechanism for erosion over that entire period. Plaintiffs' complaint expressly alleges that the traffic-generated waves and the steep off-shore gradient are the result of dredging activities. In short, there is a link between the Port's prospective liability and property damage during Landmark's period. We would finally add that although the reports do not explicitly discuss prior dredging events, there has been dredging in this area going back to at least the 1970s.

(AOE 29.) And so the parties stood, much where Landmark and Defendants stand today. The Port District argued that the erosion went back many years, to the time when Landmark insured it, while Landmark argued that the erosion the Port District was being sued over was contemporary and post-dated its coverage.

The Port District sued Landmark in February 2008. (AOE 69.) Landmark moved for summary judgment, holding to the positions excerpted above:

> The SLPR plaintiffs are very specific about the timing of the dredging activity on which they base their complaint: 1998, 2002 and 2004-05 . . . .
>
> Despite the Port's present contentions, the pleadings submitted by the Port in the *SLPR* action confirm the Port understands that the *SLPR* plaintiffs' claims are based on dredging that occurred at least 14 years after the Landmark policies expired.

//

//

(AOE 72.) Ultimately the case settled; Landmark agreed to pay the Port District $50,000 and, pursuant to a reservation of rights, agreed to defend the Port District as of May 1, 2009. (AOE 75.)

### III.     Landmark's Action Against Defendants

In June 2010, well after Landmark had settled with the Port District and agreed to defend it, it sent the same letter (with minor modifications) to each of the Defendants re-tendering its defense of the Port District to them. (AOE 30, 33, 35.) Here, Landmark essentially adopted the argument of the Port District that it had previously challenged, namely that the erosion at issue dated back many years prior to the 1998–2005 dredging:

> [T]he Port has provided substantial evidence indicating that the alleged erosion of Plaintiffs' properties potentially relates to earlier dredgings conducted by or on behalf of the Port. For example, a report prepared by the Army Corps of Engineers entitled "Coronado Shoreline Initial Appraisal Report" states that "wave energy created by boat and ship traffic within the navigable Channel offshore of the study area" has caused or contributed to the erosion. Reports such as this indicate that various dredgings occurred in the area of the Turning Basin and the Channel located near Plaintiff's properties on multiple occasions throughout the 1960's, 1970's and 1980's. These earlier dredgings implicate the [Defendants'] policies as they occurred during or prior to the [Defendants'] policy periods which contributed to the claimed damages . . . .
>
> Due to the historic nature of the dredging throughout the past few decades and the specific dredging activities occurring during the [Defendants] policy period which allegedly contributed to the erosion of the Coronado shoreline and thus Plaintiffs' properties, [Defendants] appear[ ] to have a duty to defend.

(AOE 30.) The Defendants obviously rejected Landmark's demand, and that led Landmark to file the case now before the Court.

### LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is the non-moving party's burden to show there is no factual issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet this burden, it must show that the moving party lacks any evidence to support its claims. *Id.* at 325. And if it can make that

showing, the non-moving party must respond with "specific facts" to show there is a genuine issue for trial. *Id.* at 324.

The Court considers the record as a whole and draws all reasonable inferences in the light most favorable to the non-moving party. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000). The Court may not make credibility determinations or weigh conflicting evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Rather, the Court determines whether the record "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. Not all alleged factual disputes will serve to forestall summary judgment; they must be both material and genuine. *Id.* at 247–49. "If conflicting inferences may be drawn from the facts, the case must go to the jury." *LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000) (citations omitted).

## DISCUSSION

The Defendants have filed separate motions for summary judgment, but the Court needn't consider them separately because they make, more or less, the same arguments: (1) Landmark had no duty to defend the Port District in the first place, and so can't bring an indemnification action; (2) the erosion at issue didn't occur when they insured the Port District; (3) the plaintiffs in the underlying case acquired their property after the erosion occurred and the Defendants' policies expired; and (4) claims over any erosion that occurred during Defendants' coverage periods would be time-barred.[3] It's really (2) that is the Defendants' core argument for summary judgment, so the Court will address it first.

### I. The Erosion At Issue

The key question in this case is whether the Port District was sued for erosion damage that occurred at the time it was insured by the Defendants. When was that? Pacific Indemnity insured the Port District from August 1, 1965 to August 1, 1974. (AOE 2–6.)

---

[3] There was little to no need for Defendants to file separate motions for summary judgment in this case, and in retrospect the Court should have ordered them to file a single joint motion. Not only do multiple motions require the Court to consider much duplicative and overlapping arguments, they only confuse the analysis when they don't overlap.

Travelers insured the Port District from August 1, 1974 to August 1, 1975. (AOE 7.) Northwestern insured the Port District from August 1, 1976 to May 1, 1981. (AOE 10–13.)

The Court's survey of the pleadings in the underlying case suggests a clear answer to this question: Obviously not. There may be a richer history of erosion in the San Diego Bay that's attributable to dredging, but that history is completely irrelevant if the Port District was sued only over *recent* erosion.

### A. The Duty to Defend

An insurance provider must defend its insured against claims "that create a potential for indemnity." *Horace Mann*, 4 Cal.4th at 1081. *See also La Jolla Beach & Tennis Club, Inc. v. Industrial Indem. Co.*, 9 Cal.4th 27, 43 (1994); *Gray v. Zurich Insurance Co.*, 65 Cal.2d 263, 275 (1966) ("We point out that the carrier must defend a suit which *potentially* seeks damages within the coverage of the policy."). This means, of course, that "an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded." *Horace Mann*, 4 Cal.4th at 1081.

The question whether a suit *potentially* seeks damages covered by a policy is answered "in the first instance by comparing the allegations of the complaint with the terms of the policy." *Id.* But facts extrinsic to the complaint can also give rise to a duty to defend "when they reveal a possibility that the claim may be covered by the policy." *Id.* These extrinsic facts needn't be apparent at the time the complaint is filed; if an insured later becomes aware of them and then tenders a defense, the insurer has a duty to defend. *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal.4th 643, 655 ("The defense duty arises upon tender of a potentially covered claim . . . ."); *Montrose Chem. Corp. of California v. Superior Court*, 6 Cal.4th 287, 295 (1993) ("The defense duty is a continuing one, arising on tender of defense and lasting until the underlying lawsuit is concluded."); Atlantic Mutual Ins. Co. v. J. Lamb, Inc., 100 Cal.App.4th 1017, 1034–35 (Cal. Ct. App. 2002).[4]

---

[4] Travelers argues that "[t]o be known to the insurer, extrinsic evidence must be actually tendered to the insurer during the pendency of the underlying third-party action against the insured." (Doc. No. 58-1 at 12.) The implication here is that Landmark's tender to Defendants was deficient because at the time of the tender, or at least during the pendency of the underlying state and federal claims, Landmark never came forward with

The insurance policies at issue in this case are general liability policies, and it's generally acknowledged with such policies that "[a] claim is potentially covered only if the alleged harm occurred within the policy period." *Buena Vista Mines, Inc. v. Industrial Indem. Co.*, 87 Cal.App.4th 482, 487 (Cal. Ct. App. 2001). "[I]t is neither reasonable nor consonant with the terms of general liability policies to require insurers to cover liabilities based upon facts that did not occur until after the policy period." *Id. See also Whittaker Corp. v. Allianz Underwriters, Inc.*, 11 Cal.App.4th 1236, 1241 (Cal. Ct. App. 1992) ("For the purpose of determining whether there was *coverage within the policy period*, it is well established that the time of the relevant 'occurrence' or 'accident' is not when the wrongful act was committed but when the complaining party was damaged.").[5]

This principle was first articulated in *Remmer v. Glens Falls Indem. Co.*, 140 Cal.App.2d 84 (Cal. Ct. App. 1956). The underlying case in *Remmer* involved two neighbors. In 1947, the defendants graded and filled their property, causing a landslide onto plaintiffs' property in 1952. After the defendants compensated the plaintiffs, they demanded indemnification under an insurance policy that was in effect when the grading took place but not in effect when the landslide occurred. The court ruled for the insurance company: "The general rule is that the time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed, but the time when the complaining party was actually damaged." *Id.* at 88. The *Remmer* rule still stands (and in fact has been widely adopted). *See, e.g.*, *Montrose Chemical Corp. v. Admiral Ins. Co.*, 10 Cal.4th 645, 669 (1995) ("California courts have long recognized that coverage in the context

//

---

adequate extrinsic evidence. Travelers doesn't develop this argument, though, and the Court suspects that ultimately it takes issue with the substance of Landmark's re-tender rather than its timing. Landmark re-tendered its defense to Defendants in June 2010, and it wasn't until March of 2011 that the Port District prevailed on summary judgment in state court. Around that same time, the Navy and Corps of Engineers' motions for summary judgment were finally decided.

[5] Just to be clear, this case turns on these general principles rather than a line-by-line evaluation of the Defendants' policies. The policies are all occurrence or accident-based policies and use virtually identical language to describe the coverage for property damage. (*See* AOE 2–6 at 4, 15, 31, 46, 97; AOE 8 at 176; AOE 10–13 at 262, 289, 312, 326.)

of a liability insurance policy is established at the time the complaining party was actually damaged.").

Consistent with *Remmer*, when a harm is continuous "all primary insurers over the time of the alleged continuous injury will be obligated to defend an underlying action claiming such continuous damage." *Padilla Construction Co., Inc. v. Transportation Insurance Co.*, 150 Cal.App.4th 984, 987 (Cal. Ct. App. 2007). This so-called "continuous injury trigger" was articulated and endorsed by the California Supreme Court in *Montrose*:

> We therefore conclude that the continuous injury trigger of coverage should be applied to the underlying third party claims of continuous or progressively deteriorating damage or injury alleged to have occurred during Admiral's policy periods. Where, as here, successive CGL policy periods are implicated, bodily injury and property damage which is continuous or progressively deteriorating throughout several policy periods is potentially covered by all policies in effect during those periods.

*Id*. at 689. The plaintiffs in *Montrose* sought damages for bodily injury and property damage attributable to toxic waste contamination that occurred over successive insurance policy periods. It makes intuitive sense, under *Remmer*, that this claim would be covered by each insurance policy along the way. For the "continuing injury trigger" to be pulled, however, it should be clear that a plaintiff is in fact alleging a continuous injury over time. *Buena Vista Mines*, 87 Cal.App.4th at 489. But it's important to be precise here: it is the *injury* that must be continuous, not the underlying cause of that injury.

**B.    Discussion**

Landmark, probably aware that the documentary history of SLPR's claims against the Port District is of little help to it, opens its summary judgment brief with the statement that *extrinsic evidence* from the California Superior Court case "unambiguously demonstrates dredging activity before, during and after each of [the Defendants'] policy periods." (Doc. No. 59-1 at 1.) This, of course, is completely insignificant under *Remmer*. The question isn't when dredging activity took place, but (1) *when* erosion caused by that dredging actually occurred, and (2) *whether* that is even the erosion over which the Port District was sued. So, Landmark next argues that the complaint "does not claim [the recent dredging activity]

represents the universe of dredging that contributed to the claimed loss." (*Id.* at 3.) This still doesn't get Landmark around *Remmer*. Even if historical dredging operations caused the erosion at issue, it is the timing of the erosion and not the timing of the dredging that matters.[6]

Landmark continues to argue that "facts obtained through discovery in the State and Federal *SLPR* actions, and that were relied on by the *SLPR* Plaintiffs, and known to the Defendant Insurers, indicate the potential for property damage resulting from historical dredging operations in the Channel and Turning Basin." (Doc. No. 59-1 at 3.) This argument is ambiguous as to the timing of the damage, but if Landmark is merely suggesting that historical dredging activity is partially responsible for erosion that occurred after 1998, *Remmer* forecloses the possibility of pre-1998 insurers being obligated to provide a defense. That obligation would only arise if the Port District was actually sued for erosion damage *at the time* of the historical dredging activity.

This is a point that Landmark seems determined to ignore. It covers in substantial depth documents obtained during discovery in SLPR's case against the Port District that purport to detail dredging-related erosion dating back many years. (Doc. No. 59-1 at 3–10.) Then it argues: "The extrinsic evidence regarding the dredging activities and the alleged causal connection between the activities and the claimed resulting erosion, confirms a potential for covered exposure under the defendant insurers' policies, and thus a duty to defend." (Doc. No. 59-1 at 17.) But the extrinsic evidence is all for nothing if the erosion it

---

[6] Landmark takes the astonishing position that unpleaded allegations can give rise to a duty to defend. Especially considering Landmark's own awareness that "the duty to defend depends, in the first instance, on a comparison of the allegations of the complaint and the terms of the policy." (Doc. 79 at 4.) *See Hurley Constr. Co. v. State Farm Fire & Cas. Co.*, 10 Cal.App.4th 533, 538 (Cal. Ct. App. 1992) (recognizing that an insured "may not speculate about unpled third party claims to manufacture coverage"). Landmark even cited *Hurley* in its coverage dispute with the Port District, arguing that "speculation as to unstated facts or claims not included in a complaint (let alone that contradict clear allegations) are an insufficient means to trigger an insurer's duty to defend." (AOE 73 at 2111.) The Port District, it's worth noting, also seized on omissions in SLPR's pleadings when it sued Landmark over its duty to defend: "Although the current pleading refers to dredging operations in 1998 and 2002, these allegations refer only to dredging in an area known as the 'Turning Basin.' The complaint also refers to dredging in the area known as the 'Central Navigation Channel' and does not identify the dates on which dredging of the Central Navigation Channel took place." (AOE 70 at 2056.)

details isn't the erosion over which the Port District was sued. And the record of SLPR's claims against the Port District is clear that it wasn't. What argument does Landmark have to the contrary?

One, Landmark argues that the Port District construed SLPR's claims as relating to continuous damage caused by erosion. (Doc. No. 59-1 at 12, 79 at 6.) But the Port District's position is just that—the position of an interested party that holds no legal authority whatsoever.

Two, Landmark seizes on SLPR's statement in its summary judgment opposition brief in California Superior Court that "[o]ver the past 150 years, San Diego Bay has been subjected to a myriad of artificial influences, ranging from the damming of various rivers that previously deposited sediment in San Diego Bay to the repeated and continuous dredging and disposal of dredged spoils in and around San Diego Bay. As a result of these artificial influences, Plaintiffs are currently suffering from avulsion." (Doc. No. 59-1 at 18). As the Court noted above, however, this statement is just historical background, and has no meaningful connection to the actual bases of SLPR's claims against the Port District.

Three, Landmark argues that SLPR's theory of liability "was that the [historical] dredging projects created a steeper gradient in a Channel adjacent to the SLPR Plaintiffs' homes, which in turn caused (1) erosion based on gravity causing sand to slough into the Channel and (2) which allowed larger vessels to enter into the Channel causing larger wakes which contributed to the erosion." (Doc. No. 79 at 1.) Similarly, it argues that "the long history of dredging that created a deeper Channel and gradient sinks contributed to the erosion and/or conditions allowed for erosion complained of by the SLPR Plaintiffs." (*Id.* at 8.) Whether historical dredging caused or contributed to contemporary erosion, however, isn't the issue. Under *Remmer*, that's just not enough to impose a duty to defend on the Defendants.

Four, Landmark highlights SLPR's statement in its summary judgment brief in California Superior Court that "it was known in official circles at the time of [the 1998, 2002, and 2004 dredging activities] that previous dredging projects in San Diego Bay had caused

erosion to bayfront properties" and that "the Navy, ACOE, State and Port failed to give serious consideration to the possibility that these projects would cause or exacerbate erosion to bay-front properties." (*Id.* at 7.) This doesn't show, however, that SLPR was actually suing over all previous dredging projects. To the contrary, it confirms that SLPR was suing over the 1998 through 2004 dredging activities; the earlier dredging activities are only relevant to the Port District's knowledge of and culpability for erosion resulting from those activities.

Landmark cannot point to a single allegation or statement in SLPR's pleadings that shows its lawsuit against the Port District to be based on erosion that actually occurred during the time that Defendants insured the Port District. The allegations or statements it does point to merely offer background information that, at best, shows the Port District was on notice of the potential for erosion when it began dredging activities in San Diego Bay in 1998. This is sufficient grounds to deny Landmark's motion for summary judgment and grant the motions of the Defendants.

**II.     Conclusion**

This case is simpler than the parties have made it out to be. Bayfront property owners in Coronado sued the Port District over the erosion of their property due to dredging activities in the San Diego Bay beginning in 1998. Because none of the Defendants insured the Port District then, none of the Defendants has a duty to defend the Port District. That's the end of the analysis. The Court needn't consider the other arguments raised by the Defendants.

It is true that 1998 was not the first year in which the Bay was dredged, and in fact there is evidence it was dredged during the years that Defendants insured the Port District. It also appears to be true that this historical dredging activity in the Bay contributed to the erosion of bayfront property. But the focus here is on the erosion that is the subject of SLPR's claims against the Port District, and it couldn't be more clear from SLPR's complaint and subsequent legal pleadings that *that* erosion began, allegedly, with a 1998 dredging project. Just because some erosion may have also occurred on Defendants' watch doesn't

mean a duty to defend arises. Perhaps that's something for the Port District to seize on in downplaying the damage from 1998 forward, but it's of little relevance to the coverage dispute before the Court. Landmark's summary judgment motion is **DENIED**. Defendants' summary judgment motion is **GRANTED**.

**IT IS SO ORDERED**.

DATED: July 12, 2012

*[signature]*

**HONORABLE LARRY ALAN BURNS**
United States District Judge